**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**


JOHN R. SOUTHERLAND,         :

        Plaintiff,        :
                              Case No. 3:08CV0484
 vs.                          :

                              District Judge Thomas M. Rose
MICHAEL ASTRUE,        :  Magistrate Judge Sharon L. Ovington
    Commissioner of Social
    Security,               :

        Defendant.       :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

Plaintiff John R. Southerland filed an application for Supplemental Security Income ["SSI"] and Disability Insurance Benefits ["DIB"] on March 30, 2004, claiming to have been disabled since October 17, 2001. (Tr. 57). He originally alleged disability due to depression, anxiety, panic attacks, migraines and knee problems. (Tr. 70).

Following initial denials of his application, Plaintiff was provided with an administrative hearing (Tr. 618-49), after which Administrative Law Judge

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

["ALJ"] Melvin A. Padilla issued a written decision denying Plaintiff's application. (Tr. 15-33). ALJ Padilla based his decision on a conclusion that Plaintiff was not under a "disability" as defined by the Social Security Act. (Tr. 32). The ALJ's non-disability determination later became the Commissioner's final decision. Such decisions are subject to judicial review pursuant to 42 U.S.C. § 405(g), which Plaintiff is due in the present case.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #9), the administrative record, and the record as a whole.

## II.    BACKGROUND

Plaintiff was born in 1964 and, at nearly 44 years old, was a "younger individual" when the ALJ issued his decision on January 15, 2008. (Tr. 31). He has a high school education. (Tr. 31, 76). He previously has worked as an office cleaner, stock clerk and retail clerk. (Tr. 71, 92, 100, 642).

During the February 8, 2007 hearing before the ALJ, Plaintiff testified that he was single and lived alone. (Tr. 621, 622). At that time, he weighed about 290 pounds. (Tr. 621). His only income was from welfare and food stamps. (Tr. 622). Although Plaintiff had a driver's license and could drive, he did so infrequently. (Tr. 621). His mother drove him to the hearing, and usually drove him to

appointments. (Tr. 621, 634).

Plaintiff stated that he last worked in March 2004 at Dollar General, but no longer could work due to lower back pain, knee problems and depression. (Tr. 622-23). He said that shortness of breath, nervousness and "paranoi[a]" were preventing him from being able to perform that last job, and his boss eventually no longer could accommodate his problems. (Tr. 639-40).

Plaintiff described his back pain as "constant" and "severe," with "tingling" and "numbness at times," as well as "sharp pains that go down into my right leg into my big toe." (Tr. 623). He was not wearing a back brace and recently had completed physical therapy that was ineffective for his back pain, but was "in the process of getting" spinal injections. (Tr. 623, 636). Plaintiff said that his doctor would not consider back surgery before trying such injections. (Tr. 623-24). He was using Tylenol and Naproxen for the back pain, but denied that they helped. (Tr. 624). Although he had been advised to lose weight, his inactivity had prevented him from doing so. (*Id.*).

Plaintiff said that he also experienced bilateral knee pain "all the time," especially when walking or standing. (*Id.*). He described it as "tingling" and "like a burning sensation" that at times became "a sharp pain that goes into my foot as well as up into my back." (Tr. 625). He had not tried injections in his

knees, but said that neither knee braces nor physical therapy had provided relief for the knee pain. (*Id.*). Operations already had been performed on both knees, and twice on the right knee, but did not provide relief, and no further surgery was contemplated. (Tr. 626, 637).

In addition, Plaintiff complained of left shoulder problems stemming from rotator cuff repair surgery in 1983, during which a lung collapsed. (Tr. 637-38). He said he still had "discomfort when I breathe," and occasional pain and muscle spasms. (*Id.*). He also described digestive problems that he attributed to Crohn's disease, which he was treating with Nexium. (Tr. 638-39).

Plaintiff testified that he had been depressed since 2001, and experienced depression "three or four times a week." (*Id.*). He stated that he would "get mood swings . . . where I close myself off to people" and avoid socializing. (*Id.*). He sometimes had suicidal thoughts and had "cut my hair and done other cuttings" when depressed. (*Id.*). He said he went out only once a week, for group therapy, aside from daily visits to his parents, who lived next door. (Tr. 626-27, 634). Plaintiff testified that his brother and his nephews also visited regularly, to help around the house and with yard work that he had not done himself since 2003. (Tr. 627, 640). Plaintiff was in therapy and took medication for his depression, but said those treatments were "[n]ot really" helping. (Tr.

628-29).  He still "g[o]t nervous," had "panic attacks," and "g[o]t scared at times." (Tr. 634).

Plaintiff testified that he usually did not eat much, although he had gained 25 to 30 pounds in the prior year.  (Tr. 627).  Even with Lunesta, he slept only about four or five hours a night, and "rarely" slept during the day.  (Tr. 627-28). Plaintiff testified that he could walk for about one-half block, stand for 10 to 15 minutes, sit for 15 to 20 minutes, and lift five pounds.  (Tr. 630).  He was most comfortable when reclining.  (*Id*.).  Plaintiff testified that he could dress and groom himself, but his mother tied his shoes, cooked and cleaned for him, and his parents usually did his grocery shopping.  (Tr. 631-32).  He said that he usually just "put on my sweats and a t-shirt," and no longer shaved or showered every day if he did not have an appointment.  (Tr. 641).  He accompanied his parents to the grocery store "maybe once a month," at a time when the store would not be busy.  (Tr. 640).  Plaintiff stated that he watched television and read newspapers and the Bible, and that his hobbies were playing with Hot Wheels model cars and listening to music.  (Tr. 632, 633).  He later clarified, however, that he last played cars with his nephews in about 2000.  (Tr. 641).  He denied using a computer, attending church or going to flea markets, and said he stopped going out to eat or to the movies in 2004.  (Tr. 632-33).

Plaintiff testified that his back problems predated a car accident in July 2004, and that his back condition was "about the same" after the accident. (Tr. 636).

Mark A. Pinti, a vocational expert ["VE"], also appeared as a witness at the hearing. (Tr. 641-648). Mr. Pinti testified that Plaintiff's past relevant jobs all would be classified as unskilled work, at the "light" exertional level for the office cleaner and retail clerk positions, and at the "medium" level as a stock clerk. (Tr. 642). Asked about a hypothetical person of Plaintiff's age, education and work experience, able to perform a reduced range of medium work [*i.e.*, no climbing ladders or scaffolds, no unprotected heights or kneeling, only occasional crawling and crouching, only low stress jobs with no production quotas, no fast pace, and not involving inherently hazardous or dangerous activities], Mr. Pinti testified that such a person could do all of Plaintiff's past work. (Tr. 642-43). He also said such a person could perform at least 25,000 "medium" unskilled jobs in the regional economy, including warehouse worker or industrial cleaner; about 30,000 "light" unskilled jobs, such as ticket seller or machine tender; and at least 8,000 "sedentary" unskilled jobs, including inspector or packager. (Tr. 643-44). Adding a limitation for altering positions to maintain comfort would eliminate Plaintiff's past relevant work, but other medium jobs would be reduced to about

2,000, light to about 10,000, and sedentary would be unchanged. (Tr. 644).

Additional conditions of no public contact and minimal contact with co-workers

and supervisors would not affect the number of medium jobs, would reduce the

light jobs to about 4,000, and would reduce the sedentary jobs to 6,000. (Tr. 645).

On examination by Plaintiff's counsel, the VE acknowledged that "stress is

very subjective," that each job example he cited would require some degree of

productivity, and that an individual unable to complete a normal work day or

week on a consistent basis could not maintain employment. (Tr. 647-48).

Turning to the remaining information in the administrative record, the

most significant evidence for purposes of the issues raised on this appeal consists

of Plaintiff's medical records and the opinions of medical sources relative to

Plaintiff's mental impairments, as follows:

*South Community, Inc.* The earliest documentation in this record of

Plaintiff's mental impairments is an evaluation performed in October 2001 by

Vicky Moody, D.O., a psychiatrist at South Community, Inc. ["SCI"]. (Tr. 351-

54). Plaintiff at that time was "preoccupied" with the recent breakup of a two-

year relationship. (Tr. 353, 351). The record shows that Plaintiff recited a past

history of depression, Crohn's disease with a malignant polyp, hypertension,

peptic ulcers, and orthopedic surgery on his shoulder and knee. (Tr. 351, 352).

Dr. Moody diagnosed an adjustment disorder with mixed anxiety and depression, along with probable dysthymic and personality disorders. (Tr. 353). She assigned a GAF[2] (global assessment of functioning) of 55 and recommended medication and counseling. (Tr. 354).

Plaintiff continued to be treated at SCI by Dr. Moody and a counselor, Ronald S. Haney, M.S.W./L.I.S.W. (Tr. 299-350). In November 2001, he reported "no improvement" in his irritability, depression and anxiety, despite using medication. (Tr. 350). He attributed recent panic attacks to his fear of failing in his attempt to be promoted to assistant manager at the store where he worked, and described "aggressive" verbal exchanges with his boss. (*Id.*). The following month, Plaintiff felt "better overall," despite "feeling somewhat down" about the approaching holidays. (Tr. 349). He mentioned "fighting" with his boss again, and said he had interviewed for other work. (*Id.*).

**2002:** Treatment notes from January and February of 2002 reflect Plaintiff's continued reports of anxiety and panic attacks (Tr. 348, 347), as well as problems with his roommate/former partner. (Tr. 347). In March 2002, however, Plaintiff

---

[2]The GAF scale reports a clinician's assessment of an individual's overall level of functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 30-31 (4th ed. 2000) (DSM-IV). An individual's GAF is rated between 0 and 100, with lower numbers indicating more severe mental impairments. A GAF score of 55 is characterized as moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* at 32.

was "doing better" on a new medication, "sleeping better" and feeling "calmer during [the] day." (Tr. 346). He said that co-workers had noticed his "improved attitude," and he was "coping" with continuing problems involving his roommate. Dr. Moody noted that both she and Plaintiff's primary care physician had advised him to abstain from caffeine.[3] (*Id.*). In May 2002, however, Plaintiff reported an increase in irritability, causing him to be rude to two customers and his boss at work that day. (Tr. 345). Plaintiff indicated that frustration and anxiety resulted in his becoming "angry" and "verbally aggressive." (*Id.*). He identified continuing problems with his roommate as the source of his anger. (*Id.*). Plaintiff was "doing [about the] same" in July 2002, including the same roommate issues and continuing "to display anger towards others" and to "perceive[ his] problems [as] caused by others." (Tr. 344). At appointments in September and October 2002, Plaintiff again reported stress, depression and anxiety attributed primarily to issues with his roommate. (Tr. 343, 342). He related that he had been "avoiding going to work" since an incident involving his roommate because "he felt too bad to work." (Tr. 342). Dr. Moody encouraged him "to get back to work/routine." (*Id.*).

**2003:** In January 2003, Plaintiff told Dr. Moody that his manager at work

---

[3]At his October 2001 visit, Plaintiff related drinking "4 to 6 cups of coffee and perhaps one can of caffeinated pop per day." (Tr. 352).

had offered him the assistant manager position, which he said that he declined because he did not want "the responsibilities [and] stress." (Tr. 341). But at his February 2003 appointment, Plaintiff appeared to be "remaining relatively stable," telling Dr. Moody that he had accepted the assistant manager job and was embarking on a new relationship. (Tr. 340). By June 2003, however, Plaintiff reporting quitting that job after his boss sent him home from work and called the police when Plaintiff refused to leave. (Tr. 338). His mother, too, had told Plaintiff to leave. (*Id.*). Plaintiff "repeatedly" commented that "it was their problem, not his." (*Id.*). He also reported having rekindled and re-ended his former relationship. (*Id.*). Dr. Moody noted that Plaintiff showed "appropriate concern" about his job situation and financial responsibilities, but "still tends to blame others for his behaviors." (Tr. 339). She termed Plaintiff's current problems "more characterological in nature" than due to a "major mood disorder," and repeated diagnoses of sythymia and personality disorder. (*Id.*).

In August 2003, Plaintiff reported having made two recent trips to the emergency room for panic attacks. (Tr. 337). Treatment notes indicate that his anxiety was triggered by his mother's diagnoses with lymphoma and bone cancer, and the fact that his former partner had moved back in but their problems continued. (*Id.*). At his next appointment in November 2003, Plaintiff described

feeling "despondent, overwhelmed, [and] hopeless," with some "transient

suicide ideation" but no current intent. (Tr. 336). He was not working due to

knee surgery and was facing possible foreclosure on his home. (*Id.*). Showing

less anxiety in December 2003, Plaintiff had received financial help from his

family, was back to work, and was "doing much better." (Tr. 335).

**2004:** In January 2004, Plaintiff continued to report job and relationship

problems. (*See* Tr. 332-34). He told Dr. Moody that he had begun picking at the

skin on his neck and felt calmer when it started to bleed. (Tr. 332). Dr. Moody

noted that Plaintiff's mood was irritable and his affect broad. (*Id.*). Dr. Moody

continued to diagnose dysthymic and personality disorders. (Tr. 332). Plaintiff's

therapist also remarked on "potential discontinuation of individual sessions"

with Plaintiff, opining "that as much as can be done . . . has been [done] in a

therapeutic sense" regarding Plaintiff's "codependency" issues. (Tr. 333-34). By

February 2004, Plaintiff reported increased physical health problems, including

hypertension and borderline diabetes, and acknowledged "a very high stress

level" and "vague suicidal ideation." (Tr. 330). He and his therapist discussed

the possibility of Plaintiff quitting his job and other strategies for "decreasing his

psychosocial stressors." (*Id.*). On March 10, 2004, Plaintiff reported that

migraines and "mild epileptic-type seizures" had been added to his physical

health problems. (Tr. 328). His therapist's notes state that they discussed "the fact that he needs to apply for Medicaid and Social Security Disability." (*Id.*). Two weeks later, Plaintiff's therapist again commented on the possibility that Plaintiff "may have to discontinue working altogether because the stress is so great." (Tr. 327).

On March 30, 2004, Dr. Moody recorded that Plaintiff had increased anxiety despite his troublesome roommate's departure, and complained of lethargy, low motivation and "panicky feelings at work." (Tr. 325). Plaintiff reported continuing to pick at his skin and cutting his hair off. (*Id.*). Still, she noted that Plaintiff's thoughts were organized and he experienced no delusions, hallucinations or cognitive impairment. (*Id.*). She adjusted Plaintiff's medications. (*Id.*).

On that same date, Dr. Moody completed a basic medical report for Montgomery County Job and Family Services concerning Plaintiff's ability to function in the work place. (Tr. 452-54). She deemed Plaintiff "markedly limited" in his ability to maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods;

interact appropriately with the general public; accept instructions and respond

appropriately to criticism from supervisors; get along with coworkers or peers

without distracting them or exhibiting behavioral extremes; respond

appropriately to changes in the work setting; and travel in unfamiliar places or

use public transportation. (Tr. 453). She also marked Plaintiff as "moderately

limited" in areas including his ability to maintain a schedule; sustain an ordinary

routine without special supervision; or maintain socially appropriate behavior.

(*Id.*).

In support of her assessment, Dr. Moody noted that Plaintiff recently had

experienced an increase in anxiety and mood symptoms. (Tr. 454). She

continued:

> He has been working until recently but has been
> increasing[ly] angry and verbally aggressive at work –
> towards boss, co-workers, and customers, resulting in
> [Plaintiff] being in trouble with employer frequently.
> Has been picking at skin until it bleeds. Became very
> anxious on one occasion & cut hair off. Reports having
> episodes of blackout type experiences in which he is not
> aware of surrounding[s] or what he's doing. He is
> unable to concentrate, feels overwhelmed, has poor
> energy & motivation, & experiences sleep & appetite
> disturbance. Has been feeling increasingly more
> desperate about his financial situation. Has history of
> suicidal ideation under stress.

(*Id.*).  Dr. Moody projected that Plaintiff's limitations thus described would last nine to 11 months.  (*Id.*).

Plaintiff's next mental health entry in the record – his therapist's notes from April 7, 2004 – reflect discussions with Plaintiff about the possibility of Plaintiff entering the hospital for treatment of his mental health issues.  (Tr. 324).  The therapist noted that Plaintiff was unable to work due to "physical health and emotional symptoms," and commented on Plaintiff's "courage" re applying for Medicaid and Social Security benefits.  (*Id.*).  On April 21, 2004, Plaintiff told his therapist that he had been diagnosed with "a small tumor located in the upper left quadrant of his skull" that might be responsible for his blurry vision and migraine headaches.  (Tr. 322).  The therapist reported that Plaintiff's suicidal ideation had diminished, but that Plaintiff was recognizing "that he should not be working at the present time" and planned "to follow through with social security disability."  (*Id.*).

On April 27, 2004, Dr. Moody responded to the Ohio Bureau of Disability Determination's ["BDD"] request for information related to Plaintiff's application for disability benefits.  (*See* Tr. 316-20).  She noted that Plaintiff reported being "off work a number of weeks due to 'migraine headaches,'" and having "a small brain tumor 'ab[ou]t the size of a pencil eraser.'" (Tr. 319).  She noted that he also

reported failing to keep a follow-up appointment with a neurosurgeon, variably explained as having been because he "forgot," or because "he had a 'down day.'" (*Id.*). Dr. Moody stated that Plaintiff "[w]ants excused absence from work as headaches persist but [primary care physician] won't extend medical leave." (Tr. 320). She indicated that she <u>would</u> extend Plaintiff's leave "due to [increased] depression [and] anxiety," but she also advised Plaintiff "against [the] idea of indefinite leave." (*Id.*).

On May 5, 2004, Plaintiff had his first meeting with a new case manager at SCI. (Tr. 314). Plaintiff reported "aggravation and confusion" with his current primary care physician because that doctor had given Plaintiff "nothing" for his continued headache complaints. (Tr. 314-15). The case manager recorded that "another resident at Sycamore Primary Care" purportedly had told Plaintiff that he had "a tumor or mass in [his] brain," but that his primary care physician disagreed with that diagnosis. (Tr. 315). The case manager indicated that she planned to accompany Plaintiff to an appointment with his doctor "to clarify things." (*Id.*; *see also* Tr. 313). Later that month, Plaintiff called the case manager about problems paying an overdue utility bill, and she referred him to other resources. (Tr. 311-12).

In June 2004, Plaintiff told Dr. Moody that he felt better and was sleeping

better, but still complained of having panic attacks when he went out. He reported that left his home only to go to his parent's house or to appointments. Dr. Moody added a diagnosis of panic disorder with agoraphobia. (Tr. 310).

The record reflects that Plaintiff continued to be seen at South Community later in 2004, and that Dr. Moody and Mr. Haney both prepared reports regarding Plaintiff for the Ohio BDD. (*See* Tr. 299-309).

**2005:** In a report prepared in January 2005 to support Plaintiff's Social Security application (*see* Tr. 299-302), Dr. Moody reported that Plaintiff was fully oriented and cognitively intact with no thinking disorders, but appeared to have limited insight into his own behavior. (Tr. 300). Dr. Moody noted that Plaintiff tended "to become adversarial with co-workers and supervisors as well as in personal relationships." (Tr. 301). She noted that "significant allowances on [the] part of [his] supervisor who tolerated a lot of his inappropriate work place behaviors (*e.g.*. . . .refusing to do things or telling boss off)" had allowed Plaintiff to keep his last job. (*Id.*). She opined that Plaintiff "would benefit from [a] work rehab program." (*Id.*).

Later treatment records document Plaintiff's continued visits through 2005. (Tr. 471-502). In July 2005, he described "fluctuations in mood and anxiety," telling Dr. Moody that he "[s]ometimes functions adequately," and at other times

-16-

becomes dysphoric and isolated. (Tr. 493). In September 2005, he expressed concerns to Dr. Moody about his health, saying that he had been "found to have 'spots' on [his] liver and kidney" and some evidence of enlarged lymph nodes. (Tr. 492). He told her that he was awaiting biopsy results. (*Id.*). In December 2005, Plaintiff told Dr. Moody that he had been diagnosed with renal cancer and had been in treatment for three weeks, but was "optimistic" about his prognosis. (Tr. 486).

**2006:** On March 8, 2006, Plaintiff told Dr. Moody that he was "doing alright" and "coping" with his recent cancer diagnosis and chemotherapy. (Tr. 482). He also reported benign prostate problems, as well as some sadness approaching the anniversary of his brother's death. (*Id.*).

In forms completed for the Ohio Department of Job and Family Services in March 2006 (Tr. 445, 449), Dr. Moody noted that Plaintiff continued to complain of panic symptoms, especially when leaving his home. (Tr. 449). She again referred to his history of conflict with supervisors and co-workers, reiterating that he had kept his last job "mainly because supervisor tolerated a lot of his behaviors." (Tr. 449). Dr. Moody noted that Plaintiff had become "increasingly more isolated since unemployed," and continued to suffer from depression. (*Id.*).

In June 2006, Plaintiff told Dr. Moody that he had finished chemotherapy

and had a clean follow-up biopsy, but that he had developed enlarged lymph nodes and "an enlarging liver" of unknown cause. (Tr. 476). He reported feeling "guilty" because his parents had borrowed money to bring his mortgage payments current to avoid foreclosure. (*Id.*). Still, he claimed to be "managing to cope fairly well," despite some insomnia due to stress. (*Id.*).

Dr. Moody's notes from September 27, 2006 show that Plaintiff reported having been referred to a neurologist for "some sort of mass along [his] spine." (Tr. 473). He said that he still experienced anxiety in public, but was attending group therapy for anxiety and "getting more comfortable each time." (*Id.*).

*Jerry Flexman, Ph.D.* At the request of the State agency, Plaintiff was sent to Dr. Flexman, a psychologist, for a psychological evaluation in September 2004. (Tr. 191-94). Plaintiff reported his mood as "down and anxious," but Dr. Flexman judged his affect to be appropriate with no lability. (Tr. 192). On testing, his attention span and abstract reasoning were judged to be fair, and his recent and remote memory were rated as "good." (Tr. 192-93). Plaintiff also was able to maintain concentration on simple mathematical tasks. (Tr. 193). Dr. Flexman noted, however, that Plaintiff's "response style during the assessment" was "suboptimal" and his "effort during the mental status" evaluation was "poor." (*Id.*). He judged Plaintiff's reliability also to be "poor" and suggestive of

"moderate malingering." (*Id.*).

Dr. Flexman opined that Plaintiff lacked insight into his psychological issues and had no "realistic degree of recognition" for the effect of his psychological impairment on his ability to function. (*Id.*). Dr. Flexman diagnosed dysthymia and an anxiety disorder, with dependent personality traits. (*Id.*). He assigned a GAF of 50. (*Id.*). Dr. Flexman felt that Plaintiff's ability to relate to the public was moderately impaired, as were his ability to interact with coworkers and to respond appropriately to changes in the work environment. (Tr. 194). Plaintiff's ability to respond appropriately to work pressures in a normal work setting was deemed markedly impaired. (*Id.*).

*Cindy Lou Matyi, Ph.D.* Dr. Matyi, a State agency psychologist, reviewed the file following Dr. Flexman's examination. (Tr. 417-34). She noted multiple "moderate" limitations on Plaintiff's ability to perform the mental demands of work. (Tr. 417-18). She also noted, however, Dr. Flexman's observations that Plaintiff's "[r]esponse style" was "suboptimal" and that his effort on mental status testing "was poor and suggested moderate malingering." (Tr. 419). She concluded that Plaintiff could perform simple tasks, maintain attention and make simple decisions, and likely would perform optimally in a setting that required minimal interaction with others, although he could "relate adequately on a

superficial basis" and "adapt to a setting in which duties are routine and predictable." (*Id.*). Her opinion was reviewed and affirmed on February 1, 2005. (Tr. 419, 421).

## III.   ADMINISTRATIVE REVIEW

### A.     <u>Applicable Standards</u>

The term "disability" as defined by the Social Security Act carries a specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.[4]  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. (*See* Tr. 19-32); *see also* 20 C.F.R. § 416.920(a). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful activity?

------

[4]Impairments also must be expected either to cause death or last 12 months or longer. *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920; *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

**B.    The ALJ's Decision**

At Step 1 of the sequential evaluation, ALJ Padilla found that Plaintiff had

not engaged in any substantial gainful activity since his claimed disability onset

date of October 17, 2001.  (Tr. 18).  The ALJ found at Step 2 that Plaintiff has

severe impairments that include a history of meniscal tears in both knees

requiring arthroscopic surgery; degenerative disc disease in the lumbar spine;

obesity; dysthymia; anxiety and personality disorder.  (*Id*.).

The ALJ determined at Step 3 that Plaintiff does not have an impairment or

combination of impairments that meets or equals the level of severity described

in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 22).

At Step 4, the ALJ found that Plaintiff is capable of performing a reduced range of medium work as defined for Social Security purposes, with restrictions of occasionally lifting up to 50 pounds and frequently lifting up to 25 pounds; must have the option of alternating positions as needed; no climbing ladders or scaffolds or working at unprotected heights; no crawling or kneeling; no more than occasional crouching; no more than frequent balancing and stooping; and limited to low stress jobs that are not fast paced, have no production quotas, and do not involve inherently hazardous or dangerous activities.  (*Id.*).

The ALJ further found that Plaintiff is unable to perform any of his past relevant work (Tr. 30), but found at Step 5 that Plaintiff could perform a significant number of jobs in the national economy.  (Tr. 31).  This assessment, along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for DIB or SSI.  (Tr. 32).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines:  whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria."  *Bowen v.*

*Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F.3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or whether the administrative record contains evidence contrary to those findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a

substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc.*

*Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V.    DISCUSSION

### A.    The Parties' Contentions

Plaintiff alleges that the ALJ erred in assessing his residual functional

capacity, urging that his treating psychiatrist's opinion "is inconsistent with an

ability to sustain the mental demands of work," and that the ALJ failed to apply

the correct legal standards for evaluating that and other mental health source

opinions of record.  (Doc. #8 at 1).  Urging that he "is more limited mentally than

found" by the ALJ, Plaintiff asks the Court to reverse the Commissioner's

decision and remand for payment of benefits, or at a minimum, remand for

correction of the alleged errors.  (*Id.* at 9, 14).  Significantly, Plaintiff raises <u>no</u>

challenge to the ALJ's conclusions regarding his physical impairments.  (*See* Doc.

#8).

The Commissioner, conversely, urges that substantial evidence supports

the ALJ's residual functional capacity finding and his handling of the medical

source opinions.  (Doc. #11 at 12-18).  He thus asks that the ALJ's decision be

affirmed.  (*Id.* at 19).

### B.    Medical Source Opinions

1.    _Treating Medical Sources_

Key among the standards to which an ALJ must adhere is the principle that greater deference generally is given to the opinions of treating medical sources than to the opinions of a non-treating medical source.  _Rogers_, 486 F.3d at 242; _see_ 20 C.F.R. § 404.1527(d)(2).  This is so, the Regulations explain, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examiners, such as consultative examinations or brief hospitalizations . . ."  20 C.F.R. § 404.1527(d)(2); _see also Rogers_, 486 F.3d at 242.  In light of this, an ALJ must apply controlling weight to a treating source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record.  _Rogers_, 486 F.3d at 242; _see Wilson_, 378 F.3d at 544, 20 C.F.R. § 404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, _Rogers_, 486 F.3d at 242; _Wilson_, 378 F.3d at 544, but the ALJ's analysis does not end there.  Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a
> treating source medical opinion is not well-supported
> by medically acceptable [data] . . . or is inconsistent with
> other substantial evidence in the case record means only
> that the opinion is not entitled to 'controlling weight,'
> not that the opinion should be rejected . . .

Social Security Ruling 96-2p, 1996 WL 374188 at *4. The Regulations require the

ALJ to continue the evaluation of the treating source's opinions by considering "a

host of other factors, including the length, frequency, nature, and extent of the

treatment relationship; the supportability and consistency of the physician's

conclusions; the specialization of the physician; and any other relevant factors."

*Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the

opinion of a treating physician [or psychologist] is entitled to great deference, its

non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242.

### 2. *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified

physicians and psychologists who are experts in the evaluation of the medical

issues in disability claims under the [Social Security] Act." Social Security Ruling

96-6p, 1996 WL 374180, at *2. Yet the Regulations do not permit an ALJ to

automatically accept (or reject) the opinions of a non-treating medical source. *See*

*id*. at *2-*3. The Regulations explain, "In deciding whether you are disabled, we

will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in 20 C.F.R. § 404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. § 404.1572(f); *see also* S.S.R. 96-6p, 1996 WL 374180, at *2-*3.

### C.    Subjective Symptoms/Credibility Assessment

In many disability cases, the cause of the disability is not necessarily the underlying condition itself, but rather the symptoms associated with the condition. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). Where a disability claim is based on a claimant's symptoms and not the underlying condition, a two-part analysis is used to evaluate symptom complaints. *Id.*; *see also* 20 C.F.R. § 416.929(a), *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001), *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir.1994). First, the ALJ will consider whether an underlying medically determinable impairment exists that reasonably could be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a); *see Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847 (6th Cir. 1986)). Second, if the ALJ finds that such an impairment exists, he then must evaluate the intensity,

persistence and limiting effects of the symptoms on the individual's ability to do

basic work activities, considering all of the relevant evidence. *Jones,* 945 F.2d at

1366-70. Relevant factors for the ALJ to consider in his evaluation of symptoms

include the claimant's daily activities; the location, duration, frequency, and

intensity of symptoms; factors that precipitate and aggravate symptoms; the

type, dosage, effectiveness, and side effects of any medication taken to alleviate

the symptoms; other treatment undertaken to relieve symptoms; other measures

taken to relieve symptoms, such as lying on one's back; and any other factors

bearing on the limitations of the claimant to perform basic functions. *Id.*

> Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. Consistency of the various pieces of information contained in the record should be scrutinized. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.

*Rogers*, 486 F.3d at 247-48.

It is the province of the ALJ, not the reviewing court, to evaluate the credibility of witnesses, including the claimant. *Walters,* 127 F.3d at 531; *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir.1990). Nevertheless, the ALJ must articulate on the record the reasons for his negative assessment of a claimant's credibility.

D.    **Analysis**

Plaintiff first suggests that the ALJ erred in assigning Plaintiff a Residual Functional Capacity {"RFC"] that minimized Plaintiff's mental impairments by including a limitation only to "low stress jobs that are not fast paced, have no production quotas, [and do not] involv[e] inherently hazardous or dangerous activities" (*see* Tr. 22), instead of accepting the more restrictive opinion of Plaintiff's treating psychiatrist.[5] (*See* Doc. #8 at 10). In discussing the treating psychiatrist's March 2004 opinion to that effect, however, the ALJ correctly observed that Dr. Moody had opined that Plaintiff's condition as described could be expected to last "[b]etween 9 months and 11 months." (Tr. 26, citing Tr. 454). Based on the evidence of record, ALJ Padilla reasonably deduced that Dr. Moody had not "state[d] . . . that [Plaintiff] is disabled for purposes of Social Security and

_____

[5]*I.e.,* that Plaintiff was "markedly limited" in his ability to maintain attention and concentration; work with or in proximity to others; complete a normal workday or workweek; perform at a consistent pace; interact with the general public; accept instructions and criticism; get along with coworkers; respond appropriately to workplace changes; and travel in unfamiliar places or use public transportation; and "moderately limited" in his ability to maintain a schedule; sustain routine; or maintain socially appropriate behavior. (Tr. 453).

that such disability has lasted for at least 12 continuous months." (*Id.*). As such, even if given controlling weight, Dr. Moody's opinion at that time was insufficient to establish that Plaintiff had a mental impairment that would endure for the 12 months or longer necessary to qualify as a "disability" as defined for Social Security purposes. *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. The ALJ thus did not err in declining to find Plaintiff to be disabled based on Dr. Moody's March 2004 opinion.

Beyond the issue of the duration of Plaintiff's condition, however, the record also validates the ALJ's impression that Dr. Moody only reluctantly lent support to Plaintiff's claim that his mental condition prevented him from working. The ALJ thus did not err in finding that Dr. Moody's collective opinions did not demonstrate Plaintiff to be prevented from working by a mental impairment. ALJ Padilla's observation that "the tenor of Dr. Moody's records as a whole indicates that she thinks [Plaintiff] should work" (Tr. 27) is substantiated by Dr. Moody's treatment notes from November 2002 (indicating that she "encouraged" Plaintiff "to get back to work/routine") (Tr. 342) and from April 2004 (advising Plaintiff "against [the] idea of indefinite leave," even while agreeing to extend Plaintiff's approved medical leave when his primary care physician would not). (Tr. 320). Dr. Moody's January 2005 report in support of

Plaintiff's Social Security application – indicating that Plaintiff "would benefit from [a] work rehab program" (Tr. 301) – also is scarcely suggestive that she deemed Plaintiff incapable of returning to work. And in March 2006, while again opining that Plaintiff's then-existing mental limitations could be expected to last less than the 12 months required to qualify as disabling, Dr. Moody also noted that Plaintiff had "become increasingly more isolated" since being unemployed (Tr. 449), implying that returning to work would positively affect Plaintiff's mental health. For these additional reasons, then, even if the ALJ had decided that Dr. Moody's opinions were entitled to controlling weight, those opinions still would not have compelled a conclusion that the Residual Functional Capacity found by the ALJ was flawed.

The record also provides ample justification, however, for the ALJ to conclude that Dr. Moody's opinions were not entitled to controlling weight. The treating physician rule mandates that a treating source's opinion be given controlling weight only if that opinion is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544, 20 C.F.R. § 404.1527(d)(2). Here, Dr. Moody's more pessimistic assessment of Plaintiff's work-related abilities (*see* Tr. 453) was inconsistent with the evaluations of both Dr. Flexman

(Tr. 191-94) and the state-agency reviewing psychologists. (Tr. 417-34). For example, while Dr. Flexman opined that Plaintiff's ability to respond appropriately to work pressures was "markedly impaired," he felt that Plaintiff was only "moderately impaired" in his ability to relate to the public and coworkers and to respond to workplace changes, and he noted no other limitations on Plaintiff's work-related abilities. (Tr. 194). While Dr. Matyi agreed that Plaintiff was moderately limited in his ability to perform the mental demands of work (Tr. 417-18), she also noted Dr. Flexman's observations about Plaintiff's "suboptimal" responses and "poor" effort suggesting "moderate malingering" (Tr. 419), and therefore concluded that Plaintiff was able to perform a much less limited range of work (*see id.*) than Dr. Moody's March 2004 opinion might suggest. Due to these inconsistencies between Dr. Moody's opinion and those of the other qualified mental health professionals of record, the ALJ did not err in declining to give Dr. Moody's opinion controlling weight.

Contrary to Plaintiff's contentions, ALJ Padilla also cannot be said to have erred by ultimately deciding to afford Dr. Moody's opinions only minimal weight, if any. A thorough review of the ALJ's decision reveals that in subjecting those opinions to the continued evaluation mandated by 20 C.F.R. § 404.1572(d)(2), *Rogers*, 486 F.3d at 242, and *Wilson*, 378 F.2d at 544, the ALJ

reasonably concluded that those opinions could not be credited due to their failure to withstand scrutiny under the "supportability" factor. Specifically, ALJ Padilla found that "[t]here has been a concerted effort by the claimant to misrepresent his true physical functioning and this lack of credibility is of such extent that his allegations pertaining to his psychological condition cannot be fully accepted either." (Tr. 27). Plaintiff's multiple apparent misrepresentations about his physical condition are adequately documented in the record, both as enumerated by the ALJ (*see* Tr. 20-22) and in Dr. Moody's own notes of Plaintiff's reports to her. An incomplete but illustrative list of Plaintiff's unsubstantiated medical claims made to those treating his psychological ailments includes his April 21, 2004 report to his therapist that he had been diagnosed with "a small tumor located in the upper left quadrant of his skull" (Tr. 322) and similar report to Dr. Moody of "a small brain tumor 'ab[ou]t the size of a pencil eraser'" (Tr. 319); his May 5, 2004 report to his case manager of "a tumor or mass in [his] brain" (Tr. 315); his September 2005 report of "'spots' on [his] liver and kidney" and enlarged lymph nodes, requiring biopsy (Tr. 492); his December 2005 report of a renal cancer diagnosis and treatment (Tr. 486); his March 8, 2006 description of "coping" with his recent cancer diagnosis and chemotherapy (Tr. 482); his June 2006 report of finishing chemotherapy but developing enlarged lymph nodes and

"an enlarging liver" of unknown cause (Tr. 476); and his September 27, 2006 report of having been referred to a neurologist for "some sort of mass along [his] spine." (Tr. 473).

The accuracy of the ALJ's finding that "[s]uch extreme allegations as to various types of tumors and cancers and other serious impairments [are] not medically documented" (Tr. 27) is demonstrated not only by the ALJ's successive consideration and debunking of each of Plaintiff's unsubstantiated medical claims (*see* Tr. 20-22), but also by the conspicuous absence from Plaintiff's own February 2007 hearing testimony of any mention of a brain tumor, renal cancer or a spinal mass (*see* Tr. 620-41) – serious physical afflictions that, had Plaintiff actually experienced them, surely would have enhanced Plaintiff's quest for disability benefits. The silence in Plaintiff's testimony, the administrative record as a whole, and even his sole memorandum filed in this case (*see* Doc. #8) regarding those unsubstantiated physical complaints allows for no other conclusion than that those reports were at best exaggerated, at worst patently false.

ALJ Padilla reasonably concluded that Plaintiff's unsubstantiated complaints may have so influenced Dr. Moody's opinions as to render them unreliable. Although Plaintiff takes issue with certain isolated aspects of the

ALJ's handling of evidence from Dr. Moody's reports (*see* Doc. #8 at 11), the ALJ's dubious approach to Dr. Moody's "panic order with agoraphobia" diagnosis (*see* Tr. 26, Tr. 310) is readily explained by his well-documented skepticism toward Plaintiff's subjective complaints as a whole. Observing that Plaintiff's reports to Dr. Moody of dire physical diagnoses "appear[ed] to be an effort to make the psychiatrist think that he ha[d severe] physical impairments that worsen[ed] his overall condition," ALJ Padilla mused that Plaintiff may have done so "because his medical doctors would not find him disabled." (Tr. 27). The evidence of record shows that Plaintiff introduced his purported brain tumor diagnosis to Dr. Moody in April 2004 (*see* Tr. 319, 322) in conjunction with asking her to provide him with an "excused absence from work" when his primary care physician "wo[uld]n't extend medical leave." (Tr. 320). The record also shows that although Dr. Moody ceded to Plaintiff's leave request "due to [the increased] depression [and] anxiety" he then described, she persisted in urging Plaintiff "against [the] idea of indefinite leave." (*Id.*). Although the Court cannot presume how Dr. Moody would have responded to Plaintiff's request for a leave extension absent his claim of increased depression and anxiety occasioned by a brain tumor diagnosis, significant evidence supports the conclusion that Dr. Moody's opinions advanced by Plaintiff relied at least in part on unreliable

reports from Plaintiff, and thus were not "supportable."

Plaintiff also challenges the ALJ's handling of Dr. Flexman's opinion. (*See* Doc. #8 at 12). ALJ Padilla rejected Dr. Flexman's opinion that Plaintiff was "markedly" limited in his ability "to tolerate the stress of daily work," finding that such a limitation was contravened by Plaintiff's reported daily activity level. (Tr. 27; *see also* Tr. 28). The ALJ also noted that Plaintiff had worked full-time well beyond his alleged onset date in October 2001 (Tr. 28); indeed, the record indicates that Plaintiff even was promoted to an assistant manager position in 2003. (*See* Tr. 340, 341). Moreover, as the Commissioner's opposing memorandum aptly notes (*see* Doc. #11 at 18), Plaintiff has not articulated how the Residual Functional Capacity ["RFC"] found by the ALJ – limiting Plaintiff to low stress jobs that are not fast paced, have no production quotas, and do not involve inherently hazardous or dangerous activities (Tr. 22) – fails to accommodate the workplace pressure limitation found by Dr. Flexman. And to the extent that Dr. Flexman's opinion relied on Plaintiff's subjective complaints that Dr. Flexman himself found to be suggestive of "moderate malingering" (Tr. 419) and that, for the reasons detailed, *supra*, are of questionable reliability, the record reflects an additional sound basis for the ALJ to have discounted Dr. Flexman's conclusions as unsupportable.

Even without the additional evidence undercutting Plaintiff's credibility now apparent in the record, Dr. Matyi was more skeptical[6] of Plaintiff's claims due to his possible "malingering" (Tr. 419), found him to be no more than "moderately" limited in any work-related area (Tr. 417-18), and concluded that Plaintiff could perform simple tasks, maintain attention and make simple decisions, and "relate adequately on a superficial basis" and "adapt to a setting in which duties are routine and predictable." (Tr. 419). Because Plaintiff's RFC as found by ALJ can be reconciled with those limitations expressed in Drs. Moody's and Flexman's reports that the ALJ considered to be based on credible information, and because that RFC is consistent with and supported by Dr. Matyi's opinion, ALJ Padilla is not guilty of "substituting his own opinion for that of the medical expert." (*See* Doc. #8 at 13). As such, the ALJ did not err in declining to rely on the more limiting opinions of Dr. Moody and Dr. Flexman, or in arriving at the RFC that he assigned.

**IT THEREFORE IS RECOMMENDED THAT:**

---

[6]Dr. Flexman, too, expressed skepticism about Plaintiff's stated limitations (*see* Tr. ), and even Dr. Moody characterized Plaintiff's problems as "more characterological in nature" than attributable to a diagnosable "mood disorder." (Tr. 339).

1.  The Commissioner's non-disability finding
    be AFFIRMED; and

2.  The case be terminated on the docket of this
    Court.

December 16, 2009                              s/Sharon L. Ovington
                                              Sharon L. Ovington
                                         United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).